# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**FILED**

Mar 18 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COVER SHEET

_**Instructions:** Effective November 1, 2016, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case._

**CASE NAME:**　　　　　　　　　　　　　**CASE NUMBER:** CR 21-0116 CRB

**USA V.** ZACHARY SCHULZ APTE and JESSICA SUNSHINE RICHMAN　　**CR**

| | | | |
|---|---|---|---|
| **Is This Case Under Seal?** | Yes | No ✔ | |
| **Total Number of Defendants:** | 1 | 2-7 ✔ | 8 or more |
| **Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326?** | Yes | No ✔ | |
| **Venue (Per Crim. L.R. 18-1):** | SF ✔ | OAK | SJ |
| **Is this a potential high-cost case?** | Yes | No ✔ | |
| **Is any defendant charged with a death-penalty-eligible crime?** | Yes | No ✔ | |
| **Is this a RICO Act gang case?** | Yes | No ✔ | |

**Assigned AUSA (Lead Attorney):** KYLE WALDINGER, AUSA　　**Date Submitted:** 3/18/21

**Comments:**

RESET FORM　　SAVE PDF

# United States District Court

### FOR THE
### NORTHERN DISTRICT OF CALIFORNIA

## VENUE: SAN FRANCISCO

**FILED**

Mar 18 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES OF AMERICA,

V.

ZACHARY SCHULZ APTE,
a/k/a ZACHARY APTE,
a/k/a ZAC APTE,
and
JESSICA SUNSHINE RICHMAN,
a/k/a/ JESSICA RICHMAN

DEFENDANT(S).

## INDICTMENT                    CR 21-0116CRB

18 U.S.C. § 1349 – Conspiracy to Commit Health Care Fraud;
18 U.S.C. § 1347 – Health Care Fraud;
18 U.S.C. § 1028A(a)(1) – Aggravated Identity Theft;
18 U.S.C. § 371 – Conspiracy to Commit Wire Fraud and Securities Fraud;
18 U.S.C. § 1343 – Wire Fraud;
15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5 –Fraud in Connection with the Purchase and Sale
of Securities;
18 U.S.C. § 1957 – Engaging in Monetary Transactions with Proceeds of Specified Unlawful Activity;
18 U.S.C. § 2 – Aiding and Abetting;
18 U.S.C. §§ 981(a)(1)(C), 982(a)(1) & 982(b)(1); 28 U.S.C. § 2461 – Forfeiture Allegations

A true bill.

_____/s/ Foreperson of the Grand Jury_____

Foreman

Filed in open court this ___18th___ day of

___March, 2021___ .

Melinda K. Lock

Clerk

Bail, $ ___Warrant as to both___

Magistrate Judge Sallie Kim

1  STEPHANIE M. HINDS (CABN 154284)
2  Acting United States Attorney

<div style="border: 1px solid">

**FILED**

Mar 18 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

</div>

8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                   SAN FRANCISCO DIVISION

| | |
|---|---|
| 11  UNITED STATES OF AMERICA, | ) CASE NO.   CR 21-0116 CRB |
| 12        Plaintiff, | ) <u>VIOLATIONS</u>: |
| 13     v. | ) 18 U.S.C. § 1349 – Conspiracy to Commit Health Care Fraud; |
|  | ) 18 U.S.C. § 1347 – Health Care Fraud; |
| 14  ZACHARY SCHULZ APTE, | ) 18 U.S.C. § 1028A(a)(1) – Aggravated Identity Theft; |
|       a/k/a ZACHARY APTE, | ) 18 U.S.C. § 371 – Conspiracy to Commit Wire Fraud |
| 15      a/k/a ZAC APTE, | ) and Securities Fraud; |
|  | ) 18 U.S.C. § 1343 – Wire Fraud; |
| 16        and | ) 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5 – |
|  | ) Fraud in Connection with the Purchase and Sale of |
| 17  JESSICA SUNSHINE RICHMAN, | ) Securities; |
|       a/k/a/ JESSICA RICHMAN, | ) 18 U.S.C. § 1957 – Engaging in Monetary |
| 18        Defendants. | ) Transactions with Proceeds of Specified Unlawful |
|  | ) Activity; |
| 19  | ) 18 U.S.C. § 2 – Aiding and Abetting; |
|  | ) 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1) & 982(b)(1); 28 |
| 20  | ) U.S.C. § 2461 – Forfeiture Allegations |
| 21  | ) |
|  | ) SAN FRANCISCO VENUE |
| 22  | ) |

23                      I N D I C T M E N T

24  The Grand Jury charges that, at all times relevant to this Indictment, unless otherwise indicated:

25                    <u>Introductory Allegations</u>

26         1.     The company uBiome, Inc. ("uBiome"), was a Delaware corporation formed in or about

27  October 2012.  Beginning no later than in or about 2013, uBiome maintained and purported to maintain

28  its principal place of business in the City and County of San Francisco in the Northern District of

INDICTMENT

California.

2.      UBiome maintained several corporate bank accounts at Silicon Valley Bank ("SVB"), which accounts were located in the Northern District of California.  UBiome's SVB accounts included two accounts numbered ending -4408 and -9924.

3.      The defendant ZACHARY SCHULZ APTE, who was also known as Zachary Apte and Zac Apte, was a co-founder, corporate officer, and director of uBiome.  Until approximately May 2018, APTE served as uBiome's Chief Technology Officer.  Beginning in or about that month, he assumed the position of co-Chief Executive Officer ("CEO").  Although APTE claimed at least for some purposes to be an official resident of the State of Washington beginning in or about 2017, he regularly worked and resided in the Northern District of California.

4.      The defendant JESSICA SUNSHINE RICHMAN, who was also known as Jessica Richman, was a co-founder, corporate officer, and director of uBiome.  RICHMAN served as uBiome's CEO.  Beginning in or about May 2018, RICHMAN served as uBiome's co-CEO with APTE.  Although RICHMAN claimed at least for some purposes to be an official resident of the State of Washington beginning in or about 2017, she regularly worked and resided in the Northern District of California.  At times, RICHMAN shared her residence in San Francisco with APTE.

5.      APTE and RICHMAN, through themselves and through others known and unknown to the Grand Jury, primarily controlled, operated, and managed uBiome from the time of its formation through in or about April 2019.

6.      As founders of uBiome, APTE and RICHMAN each owned many shares of Class F or other stock in uBiome ("Founder Shares").  APTE and RICHMAN each owned their Founders Shares individually or through trust vehicles.

        Background Regarding Health Care Benefit Programs and Health Insurance Billing

7.      A "health care benefit program" means "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract," as defined in Title 18, United States Code, Section 24(b).

8.      A "beneficiary" is an individual who is eligible to receive benefits under a particular

health care benefit program.

9.     Both public and private health insurance providers commonly required beneficiaries to pay a supplemental amount of money, known as a copayment ("copay"), for certain medical services, including for clinical laboratory tests.  In addition, public and private health insurance providers often had rules in place requiring beneficiaries to pay a "coinsurance" amount, or to pay out-of-pocket, for certain medical services until the beneficiaries' total year-to-date payments reached an annual deductible amount or an annual out-of-pocket limit.

10.     The Current Procedural Terminology code set ("CPT codes") was a medical code set developed and maintained by the American Medical Association.  CPT codes were five-digit numeric codes assigned to most medical, surgical, laboratory, and diagnostic tasks and services that a health care provider (including laboratories such as uBiome's) might provide to a patient.  In general, both public and private health insurance providers in the United States mandated that health care providers use CPT codes when seeking reimbursement, and the health insurance providers used CPT codes to determine the amount of reimbursement that health care providers would receive from the health insurance providers for performing particular tasks or services.

11.     The International Statistical Classification of Diseases and Related Health Problems 10th Revision ("ICD-10") was a list of codes that classified diseases and medical conditions.  ICD-10 was published by the World Health Organization.  Health care providers in the United States used a variant of ICD-10 developed by the Centers for Medicare and Medicaid Services ("CMS") called the "ICD-10 Clinical Modification."  In general, there was a unique ICD-10 code that corresponded to every disease, medical condition, sign and symptom, patient complaint, and external causes of injury or disease.

12.     A National Provider Identifier ("NPI") number was a unique 10-digit identification number issued to health care providers in the United States by CMS.  The NPI number was the required identifier for Medicare services in the United States, and it was also used by other U.S. public and private health insurance providers.  In general, all U.S. health care providers – including physicians, physician assistants, and nurse practitioners – were required to obtain and use NPI numbers.

13.     The CMS Form 1500 was commonly used to submit reimbursement claims to both public and private insurers.  In general, the CMS Form 1500 required data such as the date of service, the

applicable ICD-10 and CPT codes, and the name and NPI number of a physician or other health care

provider.  By signing the CMS Form 1500, the physician or other health care provider certified that the

services listed on the form were medically necessary.

<div align="center">UBiome's Business</div>

14.     UBiome submitted health insurance claims to private insurers, including, but not limited

to, health insurance companies in the Blue Cross Blue Shield Association (including, but not limited to,

Anthem Blue Cross, Blue Cross Blue Shield of Michigan, and Blue Shield of California), Cigna,

Harvard Pilgrim Health Care, HealthNet, Kaiser Permanente, and UnitedHealthcare/Optum.  Among the

private insurers to which uBiome submitted claims were insurers providing coverage to (a) federal

Medicare beneficiaries enrolled in Medicare Advantage plans offered under Medicare Part C (42 U.S.C.

§ 1395w-21 *et seq.*), which plans were a way to receive Medicare Part A and Part B coverage offered by

Medicare-approved private companies that were required to follow rules set by Medicare, (b) Amtrak

employees, retirees, and their families, and (c) federal employees, annuitants, and their families under

the Federal Employee Health Benefits Program ("FEHBP") operated and administered by the Office of

Personnel Management ("OPM").  The FEHBP was a federally funded medical insurance program

established by the Federal Employees' Health Benefits Act (Public Law 86-382), the provisions of

which are implemented by OPM through federal regulations.  In addition, uBiome submitted claims to

numerous private-sector employer-sponsored health plans under which medical benefits, items, and

services were provided to individuals ("Private Benefit Programs").  The provision of these benefits

occurred via certain administrative agreements with administrative service organizations.  These Private

Benefit Programs were covered under Section (3)(1) of the Employment Retirement Security Act of

1974, as they were established and maintained by an employer for the purpose of providing for the

employer's participants' and their beneficiaries' health and welfare benefits.

15.     UBiome also submitted health insurance claims to public insurers, including, but not

limited to, (a) TRICARE (a government health care benefit program for military members, retirees, and

their families), (b) the Civilian Health and Medical Program of the Department of Veterans Affairs

("CHAMPVA") (a governmental health care program for spouses, widow(er)s, and children of certain

military veterans), and (c) Medi-Cal Managed Care Organizations that contracted with Medi-Cal (a

California-administered public healthcare system jointly funded by the state and federal governments).

16.     All of the private and public insurers to which uBiome submitted reimbursement claims were "health care benefits programs" under Title 18, United States Code, Section 24(b).  Between 2015 and 2019, uBiome submitted more than $300 million in reimbursement claims to private and public health insurers, which paid uBiome more than $35 million on those claims.

17.     Initially, uBiome offered one product to consumers: a direct-to-consumer test that it ultimately marketed under the name "Explorer" and for which it generally charged less than $100.  For its "Gut Explorer" test, uBiome performed genetic sequencing in its laboratory from a portion of an individual customer's fecal sample and then provided that individual customer with a report comparing the composition of her gut microbiome to the microbiomes of others who had submitted fecal samples to uBiome.  UBiome marketed Explorer as a way to get a better understanding of what was going on in one's gut; the product was not marketed as a diagnostic tool or as a tool for use by medical clinicians.  UBiome charged customers directly for the Explorer test; it did not submit reimbursement claims to health insurance providers for the Explorer test.

18.     By no later than in or about 2014, APTE and RICHMAN had recognized that uBiome's Explorer test would not generate the significant revenue that uBiome, APTE, and RICHMAN needed to attract large-scale venture capital investment in the company.  Accordingly, APTE and RICHMAN decided that uBiome should develop and market "clinical" tests, *i.e.*, laboratory tests whose results would ostensibly be used by medical professionals to make medical decisions.  Toward this end, APTE and RICHMAN caused uBiome to apply for a Clinical Laboratory Improvement Amendments ("CLIA") certificate of registration.  Such certificate, or similar certificate, was a prerequisite in order for a U.S. laboratory such as uBiome's to conduct testing of human biological samples "for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings," as required by Title 42, United States Code, Section 263a.  UBiome initially obtained its CLIA certificate of registration from CMS and its associated clinical laboratory license from the California Department of Public Health in or about December 2014.  CMS later issued uBiome a certification of accreditation in or about September 2016 based on uBiome's laboratory's accreditation by the College of American Pathologists.

19.     Pursuant to CLIA and its regulations, including 42 C.F.R. § 493.1253, companies such as uBiome that introduced a laboratory-based test system not subject to FDA clearance or approval were required, before reporting patient test results, to establish for such test system performance specifications for various performance characteristics.  These performance characteristics included accuracy, precision, analytical sensitivity, and analytical specificity, among others.  A laboratory's establishment of these performance specifications was commonly referred to as test "validation."

20.     By no later than in or about late 2015, uBiome began to market a "clinical" version of its gut test to individual customers who had previously submitted Gut Explorer samples to uBiome. Although uBiome used different names for its gut test, the clinical version of its gut test was ultimately marketed as "SmartGut."  UBiome submitted the first claims for reimbursement to private insurers for its clinical gut test in or about November 2015, although it did not officially launch SmartGut until on or about November 1, 2016.  UBiome later made changes to SmartGut, including by the addition of new microorganisms detected by the test.  UBiome began marketing "SmartGut version 2.0" in or about late 2017.  It began marketing "SmartGut version 3.0" in or about August 2018.

21.     In and around November 2017, uBiome launched a clinical test that identified bacteria in the vaginal microbiome and marketed it as the "SmartJane" test.  As with its SmartGut test, uBiome subsequently developed SmartJane versions 2 and 3.

22.     UBiome represented to investors that SmartGut and SmartJane were "ordered by doctors, and reimbursed by insurance."  As it concerns "ordered by doctors," uBiome used multiple means of securing "orders" from health care providers for SmartGut and SmartJane tests.

a.      Early in uBiome's efforts to submit for reimbursement, from approximately November 2015 to in and around March 2017, uBiome's Chief Medical Officer reviewed test requests submitted by customers, including by uBiome employees, and approved or denied those requests, generally without synchronous interaction with the customer.

b.      In or about and between July 2016 and mid-2017, uBiome endeavored to build a network of health care providers external to uBiome, who had an established patient base, but such external health care providers did not generate a sizeable volume of orders for SmartGut.

c.      In or around March 2017, uBiome entered into a services agreement with a

company involved in the business of women's reproductive health services and products, by which uBiome relied on that company's network of health care providers to review uBiome's customers' requests for SmartGut.

        d.     In and around October 2017, uBiome contracted with two *locum tenens* (*i.e.*, temporary medical staffing) agencies, by which uBiome used health care providers with each staffing agency to approve or deny customer requests for SmartGut, and later, SmartJane.  UBiome employees referred to the collection of providers hired through these staffing agencies, together with a few other doctors with whom uBiome had contracts for services, as the "External Clinical Care Network" or "ECCN."  The ECCN was made up of doctors, nurse practitioners, and other health care providers who were retained by the *locum tenens* staffing agencies, and whom uBiome interviewed and approved prior to their participation in the ECCN.  The ECCN health care providers were paid an hourly fee through the *locum tenens* staffing agencies, which in turn were paid by uBiome.

       23.     Beginning no later than in or about November 2015, and continuing until in or about April 2019, uBiome submitted reimbursement claims for performing SmartGut and SmartJane tests on fecal and vaginal samples submitted by its customers to health insurance providers that were health care benefit programs under Title 18, United States Code, Section 24(b).  Each of these health insurance providers offered health insurance benefits to beneficiaries.  UBiome's particular reimbursement claims were in various amounts up to approximately $2,970.  UBiome submitted these reimbursement claims by transmitting data required by the CMS Form 1500.  In doing so, uBiome affixed the ordering health care providers' identifiers, attesting to the medical necessity of the laboratory test.  Those reimbursement claims also included CPT codes chosen by uBiome employees, NPI numbers for both uBiome and the health care provider who had ostensibly ordered the SmartGut or SmartJane test, and ICD-10 codes ostensibly chosen by health care providers.

<div align="center">Other Entities and Individuals</div>

       24.     The limited partnerships identified in this Indictment as "EP Fund I," "EE Fund I," and "E Fund I" were venture capital funds that were formed under the laws of the state of Delaware.  The Delaware limited liability company identified in this Indictment as "EP GP I," or a similarly named and affiliated limited liability company, served as the general partner of the three funds identified above and

made, or assisted in making, investment decisions on behalf of those funds.  EP Fund I, EE Fund I, E Fund I, and EP GP I maintained offices in the Northern District of California.

25.     The limited partnership identified in this Indictment as "A Fund IV" was a venture capital fund that was formed under the laws of the state of Delaware and that maintained offices in the Northern District of California.

26.     The limited liability company identified in this Indictment as "S Fund" was a venture capital fund that was formed under the laws of the state of Delaware.  It thereafter registered in the state of California and maintained offices in the Northern District of California.

27.     The limited liability company identified in this Indictment as "O Fund" was a venture capital fund that was formed under the laws of the state of Delaware and that maintained offices in the state of Illinois.

28.     The limited liability company identified in this Indictment as "B Investments" was a venture capital fund that was affiliated with O Fund.  B Investments was formed under the laws of the state of Delaware and that maintained offices in the state of Illinois.

29.     The limited partnership identified in this Indictment as "CP Fund III" was a venture capital fund that was formed by a California-based financial institution under the laws of the state of Delaware.  It thereafter registered in the state of California and maintained offices in the Northern District of California.

30.     The individual identified in this Indictment as "Investor 1" was an individual who maintained a residence in the Northern District of California.  Investor 1 maintained a family investment office located in the Northern District of California.

31.     The individual identified in this Indictment as "Investor 2" was an individual who maintained a residence in the Northern District of California.

32.     The limited liability company identified in this Indictment as "I Fund" was a venture capital fund that was formed under the laws of, and maintained offices in, the state of New York.

33.     The limited partnership identified in this Indictment as "HP Fund III" was a venture capital fund that was formed under the laws of the state of Delaware and that maintained offices in the state of New York.

INDICTMENT                              8

34.     The limited liability company identified in this Indictment as "BG Fund Two" was a venture capital fund that was formed under the laws of the state of Delaware and that maintained offices in the state of New York.

35.     The limited liability identified in this Indictment as "D Capital" was a venture capital firm that was formed under the laws of the state of California.  D Capital managed a venture capital fund identified in this Indictment as the "G Fund."

36.     The United States Securities and Exchange Commission is an independent agency of the United States government responsible for enforcing the federal securities laws, which are designed to provide the investing public with full disclosure of all material facts regarding matters involving the offer, purchase, and sale of securities, among other things.  These laws protect the investing public in the purchase of stock by maintaining fair and honest securities markets and eliminating manipulative practices that tend to distort the fair and just price of stock.

<u>Conspiracy and Scheme and Artifice to Defraud Health Care Benefit Programs</u>

37.     Beginning on a date unknown to the Grand Jury, but by no later than in or about November 2015, and continuing until in or about April 2019 as to both defendants, in the Northern District of California, and elsewhere, the defendants APTE and RICHMAN knowingly and willfully, and with the intent to defraud, executed and attempted to execute a scheme and artifice to defraud health care benefit programs as to a material matter and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, money and property owned by, and under the custody and control of, those health care benefit programs, all in connection with the delivery of, and payment for, health care benefits, items, and services.  Among other purposes, APTE and RICHMAN engaged in the scheme and artifice for the purpose of inducing and attempting to induce health insurance providers to pay money to uBiome, all in order to obtain funds for the operations of uBiome, to make it appear to investors that health care providers' orders for uBiome's clinical tests were routinely reimbursed by health insurance providers, and to project the appearance to investors that such reimbursable orders were increasing on a monthly basis.

As part of the conspiracy and scheme and artifice to defraud health care benefit programs:

38.     APTE and RICHMAN developed, implemented, and oversaw a series of fraudulent

1   practices designed to deceive approving health care providers and reimbursing insurance providers

2   regarding tests that were not validated and not medically necessary, and then falsified documents and

3   lied about and concealed material facts when insurance providers asked questions to which truthful

4   answers would reveal the fraudulent nature of uBiome's billing model.  These practices included

5   (1) fraudulently submitting reimbursement claims for re-tests or re-sequencings of archived samples

6   (referred to internally as "upgrades"); (2) utilizing a captive network of doctors and health care

7   providers to whom uBiome fraudulently gave partial and misleading information about the test requests

8   they were reviewing; (3) fraudulently submitting reimbursement claims with respects to tests that had

9   not been validated under CLIA standards and/or for which patient test results had not yet been released;

10  (4) manipulating dates of service to conceal uBiome's actual testing and marketing practices from

11  insurance providers, and to try to maximize billings; (5) fraudulently not charging patients for patient

12  responsibility required by insurers, and instead, in some cases, incentivizing them with gift cards, and

13  then making false or misleading statements about, or concealing, those practices from insurance

14  providers; and (6) falsifying documents, using the identity of doctors and other health care providers

15  without their knowledge or authorization, and lying to insurance providers in response to requests for

16  information, overpayment notifications, requests for recoupment of billings, denials of reimbursement

17  requests, or audits investigating uBiome's billing practices.

18                                              *Upgrades*

19          39.     At the direction of APTE and RICHMAN, uBiome developed a practice referred to by

20  various names, including "re-sequencing" and "upgrading" (hereafter referred to as "upgrades").

21  Upgrades were internally referred to at uBiome as a "growth hack," through which APTE and

22  RICHMAN intended to increase numbers of billable claims by marketing to customers who had

23  previously submitted fecal or vaginal samples to uBiome to have those archived samples reprocessed

24  through newer versions of uBiome's tests.  This practice was fraudulent for numerous reasons, including

25  because, in general, the health care providers who were presented with uBiome customer requests for

26  upgrades were commonly never informed that the request pertained to an archived (and thus dated)

27  sample, and were similarly commonly not informed that the sample at issue had already been tested and

28  a report issued.  This practice also was fraudulent because, in general, uBiome made little or no effort to

INDICTMENT                        10

1    inform insurers at the time of submitting reimbursement claims for upgrades that uBiome had previously

2    submitted a claim for testing the same sample and/or that the test for which uBiome was seeking

3    reimbursement had been performed on an archived (and thus dated) sample.

4        40.    Beginning in and around October 2015 and continuing at least through late 2018, uBiome

5    marketed to purchasers of Explorer that it had developed a clinical version of its gut test and informed

6    customers that they could request that uBiome re-test or "upgrade" their archived fecal samples under

7    the clinical protocols.  When some of those individual customers requested such upgrades in response to

8    these marketing efforts, and provided uBiome with their health insurance information, APTE and

9    RICHMAN caused those requests to be submitted for approval to uBiome's Chief Medical Officer or to

10   health care providers in the ECCN, who approved many or most of the requests submitted to them.

11   UBiome's insurance claims, as submitted through the CMS Form 1500, represented that the tests were

12   medically necessary as ordered by the Chief Medical Officer or ECCN health care providers, who

13   generally had never had any synchronous interaction with the customers for whom APTE and

14   RICHMAN caused the claims to be submitted.

15       41.    Initially, and through at least the fall of 2017, uBiome communicated to customers and to

16   relevant employees that upgrades commonly involved a two-sample process in which uBiome tested

17   both the customer's archived sample as well as a newly supplied sample from the customer under the

18   same clinical testing protocols and procedures.  In March 2017, uBiome's co-laboratory directors

19   expressed concern regarding uBiome's upgrades of Explorer samples, and about upgrades in general.  In

20   an email to APTE and RICHMAN, the co-directors stated, among other things, that there was no current

21   clinical relevance to archived samples.  APTE agreed not accept new Explorer upgrade requests after

22   March 13, 2017.  Those co-directors left their roles shortly thereafter, and APTE and RICHMAN did not

23   inform the subsequent laboratory directors about their concerns pertaining to upgrades.  Instead, APTE

24   and RICHMAN caused false representations to be made to uBiome's subsequent laboratory director that

25   health care professionals would make determinations as to whether testing an archived sample would

26   yield information beneficial to the customer.  However, as discussed below, APTE and RICHMAN

27   concealed from ECCN health care providers which test requests actually pertained to upgrades of

28   archived samples.  Thus, in truth and in fact, APTE and RICHMAN, knowing that upgrades of archived

INDICTMENT                                    11

1    samples were not likely to be deemed medically necessary or to have clinical utility, and thus that

2    upgrades were likely not reimbursable by most health insurance coverage, fraudulently caused uBiome

3    to withhold information from health care providers that was relevant and material to their determinations

4    of the potential clinical utility of re-testing an archived sample.

5        42.    At the direction of APTE and RICHMAN, uBiome advertised and marketed its clinical

6    tests SmartGut and SmartJane both on online forums and on websites and directly to consumers through

7    email campaigns.  Beginning in or about late 2017, these advertising and marketing efforts also related

8    to encouraging customers to request that their archived fecal and vaginal samples be upgraded to a

9    newer version of SmartGut or SmartJane.  UBiome's upgrade campaigns, at APTE and RICHMAN's

10   direction, were designed to make the upgrade process as fast as possible for the customer, including

11   through a process in which customers could upgrade all their archived samples with "one click."  APTE

12   and RICHMAN approved of and caused these marketing efforts in order to make it as easy as possible

13   for customers to upgrade all of their archived samples, all for the purpose of increasing the number of

14   claims submitted to health insurance providers on a monthly basis.

15       43.    In order to obtain health care provider approval for customer upgrade requests, and

16   recognizing that providers external to uBiome were not ordering uBiome tests in any significant volume,

17   APTE and RICHMAN caused uBiome to create the ECCN.  Although APTE and RICHMAN had

18   received legal advice informing them that a network of providers like the ECCN would not be proper if

19   uBiome wanted to submit for reimbursement, APTE and RICHMAN nonetheless established the ECCN

20   and used it as an engine for generating claims for reimbursement to insurance companies.  UBiome

21   established a web-based portal (the "doctor portal") by which ECCN providers reviewed all test

22   requests, including upgrade requests, from customers.  APTE and RICHMAN set up the doctor portal to

23   make the health care provider approvals of test requests as fast as possible, and to minimize the chances

24   that ECCN providers would decline to approve customer's test requests.  For example, APTE and

25   RICHMAN fraudulently caused the doctor portal not to inform ECCN providers when a customer was

26   requesting an upgrade.  For those upgrade requests, APTE and RICHMAN also fraudulently caused the

27   doctor portal not to inform ECCN providers that the customer symptoms by which the ECCN providers

28   were to determine medical necessity were not current and that the request pertained to an upgrade of an

1   archived sample stored at uBiome.  Because the upgrade process was capable of generating multiple test

2   requests by a single customer at one time, APTE and RICHMAN fraudulently caused to be concealed

3   from ECCN providers that certain customer requests pertained to upgrades, and that certain customers

4   had requested multiple upgrades.  One means by which APTE and RICHMAN did so was by staggering

5   the rate at which a single customer's multiple upgrade requests entered the doctor portal.  By taking

6   these and other actions, APTE and RICHMAN essentially controlled the information provided to ECCN

7   providers, including by concealing information material to the ECCN providers' determinations of

8   clinical utility and medical necessity, with respect to upgrades and otherwise.  They thereby caused

9   doctors and other health care providers to approve upgrades that were not medically necessary or that

10  did not have clinical utility, based on information they fraudulently caused to be incomplete, and then

11  fraudulently caused uBiome to submit such claims for reimbursement.

12                      *Submission of Reimbursement Claims Before Validation*

13          44.     UBiome validated its clinical gut test (then referred to as "GutCheck") pursuant to the

14  CLIA regulations in August 2016.  However, APTE and RICHMAN caused uBiome to submit

15  numerous reimbursement claims to insurance providers beginning in November 2015, in part to show

16  investors that uBiome could earn significant revenue through clinical billings.  APTE and RICHMAN

17  did so despite knowing that uBiome had neither validated that particular clinical gut test pursuant to

18  CLIA nor issued any patient test results, and despite knowing of concerns raised by certain uBiome

19  personnel about the propriety of billing health insurance providers under such circumstances.

20          45.     In addition to marketing and submitting claims for reimbursement for the clinical version

21  of its gut test referenced above before it was validated pursuant to the CLIA regulations, and before

22  uBiome released the test results to ordering health care providers and to customers, APTE and

23  RICHMAN caused uBiome regularly to do the same with later upgrade campaigns.  For example,

24  SmartGut version 2 was validated pursuant to the CLIA regulations in and around February 2018 and

25  the test results under that version of the test were issued beginning in or after April 2018.  Nevertheless,

26  APTE and RICHMAN caused uBiome to submit reimbursement claims in late 2017 and early 2018 for

27  tests that it intended to conduct, but had not yet conducted, on samples pursuant to SmartGut version 2.

28  In so doing, APTE and RICHMAN caused uBiome to submit reimbursement claims where the service

had not yet been rendered because uBiome had not issued any test results, or even conducted a new test of the archived sample.  Similarly, despite employee concerns directed to APTE, APTE and RICHMAN caused uBiome to submit reimbursement claims for SmartJane version 3 in and about the fall of 2018, knowing that results would not be available until December 2018.

46.    In addition to directing and assisting in the creation of Chart Notes to provide to insurers (as discussed in more detail below), and in order to fraudulently conceal that uBiome had billed insurers prior to release of test results to customers, APTE and RICHMAN also directed uBiome employees to provide uBiome test results that had not yet been finalized (and therefore had not yet been released to customers or health care providers) to at least one insurer in or about April 2018, without any indication to the insurer that these test results had not been released to the customer or health care provider.

*Manipulation of Dates of Service*

47.    One of the means by which APTE and RICHMAN schemed to defraud insurance providers was by manipulating the dates of service, which were set forth on the CMS Forms 1500 that uBiome submitted to insurance providers in support of its reimbursement claims.  Rather than apply a consistent method to entering the date of service on the CMS Form 1500, APTE and RICHMAN caused uBiome to use different dates of service depending on numerous criteria, including, but not limited to, whether the order related to a newly collected sample or to an upgraded archived sample and whether uBiome employees predicted that the uBiome's customers had more likely reached their insurance policy deductible or out-of-pocket limits based on the calendar date.

*Fraudulent Lack of Collection of Patient Responsibility and Gift Card Incentives*

48.    As alleged above, public and private health insurance providers commonly required beneficiaries to pay copays or other payments as part of their cost-sharing obligation for their medical care.  Because both health care providers and beneficiaries were aware that out-of-network services from providers such as uBiome commonly entailed high cost-sharing obligations for beneficiaries, an assurance by out-of-network providers that any patient financial responsibility would be waived by the provider served to induce the ordering of additional, unproven, or investigational services without regard for the increased costs that such ordering entailed for the health insurance provider.  As set forth in more detail below, APTE and RICHMAN caused uBiome to adopt practices that waived patient cost-sharing

1  obligations, as well as practices that financially rewarded customers for submitting test requests, which

2  served to fraudulently and improperly induce patient to request uBiome tests.

3       49.    At the direction of APTE and RICHMAN, uBiome communicated to customers and

4  potential customers that, during its "pilot period," uBiome would cover all costs not covered by a

5  customer's health insurance.  Even after uBiome ostensibly ended its pilot in or about July 2018, APTE

6  and RICHMAN ensured that virtually all of uBiome's customers would be covered by the company's

7  so-called "patient assistance program" until approximately mid-February 2019, meaning that, until that

8  time, uBiome made no significant efforts to collect patient responsibility.  APTE and RICHMAN

9  ensured that uBiome adopted these policies and took these actions because they believed that many or

10  most of uBiome's potential customers would not request SmartGut or SmartJane tests if uBiome

11  collected copays, coinsurance, or other out-of-pocket payments from them, which then would have

12  resulted in uBiome not receiving any payments from insurers for such tests not sought and in uBiome

13  not being able to report increasing billable sample numbers to its Board of Directors and investors.

14       50.    In addition to a long-running "pilot" program in which customers were not required to

15  make customer responsibility payments, uBiome further incentivized customers to return samples by

16  rewarding them at times with gift cards when they did return samples.

17       51.    Although uBiome made no significant efforts to collect patient responsibility until mid-

18  February 2019, APTE and RICHMAN ensured that uBiome employees made efforts to obtain payments

19  made directly to beneficiaries by health insurance providers, which payments by health insurance

20  providers were premised on the assumption that the beneficiaries were obligated to pay, and/or had paid,

21  uBiome for the cost of uBiome's tests.

22       52.    Knowing that public and private health insurance providers would not pay reimbursement

23  claims for uBiome's clinical tests if uBiome routinely waived or failed to attempt to collect copays,

24  coinsurance, and other beneficiary liabilities, APTE and RICHMAN employed various fraudulent

25  methods to deceive certain health insurance providers that uBiome had ended its "pilot period" in mid-

26  2018 and was no longer routinely waiving collection of patient responsibility.

27  *Fraudulent Responses to Insurance Providers' Requests for Information*

28       53.    Beginning in and around April 2018, at the direction of APTE and RICHMAN, uBiome

employed various methods in an attempt to deceive health insurance providers, both (a) in response to information requests, overpayment notifications, recoupment requests, and audits received from those health insurance providers and (b) to support uBiome's appeals of the health insurance providers' initial reimbursement determinations.  At the direction of APTE and RICHMAN, in response to inquiries from health insurance providers for further documentation, uBiome used the identity of doctors and other health care providers without their knowledge or authorization, and did so by creating false documents that it provided to health insurance providers that purported to be health care providers' genuine "Chart Notes."  Each of these Chart Notes purported to be a health care provider's documentation of an encounter between the health care provider who ordered the uBiome test and the health insurance beneficiary that occurred on or about the date of service set forth in the reimbursement claim submitted to the health insurance provider by uBiome.  In reality, the Chart Notes were in many cases manufactured documents that did not reflect the actual memorialization of any real encounters between health care providers and beneficiaries or any encounters on the dates listed on the Chart Notes.  Instead, many of the Chart Notes were created without the knowledge or direction of the health care providers whose names and NPI numbers appeared on the Chart Notes.  These were submitted to insurance providers to conceal from insurance providers the fraudulent nature of the underlying billings, to mislead the insurance providers into believing that real encounters had occurred between health care providers and beneficiaries on the dates listed on the Chart Notes, to dissuade the health insurance providers from seeking recoupments regarding prior reimbursements, and, ultimately, to insure that the health insurance providers continued to provide reimbursements to uBiome in response to its claims.

54.     In other correspondence to health insurers in response to the requests for further documentation, in and around July 2018, APTE and RICHMAN caused uBiome to falsely represent to a health insurer that the "pilot" had been "short term," when APTE and RICHMAN knew that they have developed and maintained the pilot period for more than two years.  APTE and RICHMAN also caused uBiome to falsely represent that uBiome had terminated its pilot and was billing each patient for his or her financial responsibility, unless the patient qualified for uBiome's "patient assistance program."  In fact, APTE and RICHMAN knew that that uBiome did not make genuine efforts to verify eligibility for the "patient assistance program" and that the company was not endeavoring to collect patient

1  responsibility from most patients.

2  <u>Conspiracy and Scheme and Artifice to Defraud Investors and Potential Investors</u>

3  55.  Beginning on a date unknown to the Grand Jury, but by no later than in or about 2015,

4  and continuing until in or about April 2019 as to both defendants, in the Northern District of California,

5  and elsewhere, the defendants APTE and RICHMAN knowingly, and with the intent to defraud, devised

6  and intended to devise a scheme and artifice to defraud investors and potential investors (hereafter

7  "investors") as to a material matter and to obtain money and property from investors by means of

8  materially false and fraudulent pretenses, representations, and promises, and by concealment of material

9  facts.  Among other purposes, APTE and RICHMAN engaged in the scheme and artifice in order to

10  induce and attempt to induce investors to invest funds in equity and debt issued by uBiome, which funds

11  could be used both to pay for the operations of uBiome and to personally enrich APTE and RICHMAN.

12  As part of the conspiracy and scheme and artifice to defraud investors:

13  56.  APTE and RICHMAN developed, implemented, and oversaw an effort to deceive and

14  mislead investors about various aspects of uBiome's business including, but not limited to, the success

15  of uBiome's business model in terms of revenues and reimbursement rates; the threats to future revenues

16  represented by uBiome's failure to collect patient responsibility, marketing of upgrades, and reliance on

17  the ECCN to generate orders; and the lack of clinical utility and acceptance in the medical community of

18  uBiome's tests.  As part of this effort, APTE and RICHMAN made and caused to be made various

19  material misrepresentations and false and misleading statements and omissions to investors from in or

20  about late 2015 through in or about early 2019.  By virtue of these misrepresentations, false and

21  misleading statements, and omissions, APTE and RICHMAN induced numerous investors to invest tens

22  of millions of dollars in uBiome equity and debt, as well as to purchase more than $12 million dollars of

23  uBiome stock from APTE and RICHMAN themselves.

24  *Series B Fundraising*

25  57.  During uBiome's "Series B" fundraising round, which occurred primarily during 2016,

26  APTE and RICHMAN made, and caused to be made, various material misrepresentations to investors.

27  These material misrepresentations included that uBiome had revenues from health insurance providers

28  related to "clinical billing" in excess of $200,000 in each of November 2015 and February 2016, that its

1   billings to date had generated an average selling price of more than $850, and that more than 80% of

2   claims had been paid "by 50 days."  APTE and RICHMAN knew that these revenue representations

3   were false and misleading because they knew that each of the following was far less than that which

4   investors were led to believe: (i) the total actual amount of money actually paid by health insurance

5   providers to uBiome, (ii) the average amount of money that uBiome had received per claim from

6   insurers based on the total of all claims submitted, and (iii) the percentage of claims paid within 50 days

7   of submission.  Indeed, APTE and RICHMAN knew that, based at least in part on concerns raised by

8   certain uBiome personnel about the propriety of billing health insurance providers, uBiome had sent

9   back checks or declined to deposit certain checks that it had received from health insurance providers

10  related to its November 2015 billings.  As a result of these misrepresentations, investors were presented

11  with a fraudulent picture of uBiome's actual revenues, overall financial health, and potential future

12  revenues during this fundraise.

13        58.    In addition to material misrepresentations to investors regarding uBiome's revenues,

14  APTE and RICHMAN also made, and caused to be made, material misrepresentations during uBiome's

15  Series B fundraising round regarding the CPT code employed by the company when billing for its

16  clinical gut test.  Rather than employing a single CPT code when it conducted its November 2015

17  "billing pilot," as APTE and RICHMAN represented to some investors, uBiome had in truth conducted

18  "A/B" testing in which it had submitted some claims under a single CPT code and some claims under

19  "bundled" codes.  By making these misrepresentations, APTE and RICHMAN sought to lead investors

20  to conclude that uBiome's clinical gut test was clearly covered by a single established CPT code and

21  that, therefore, there was a higher likelihood that uBiome would receive payments from insurance

22  companies consistent with that CPT code.

23        59.    During uBiome's Series B fundraising round, in or about May 2016 and September 2016,

24  respectively, APTE and RICHMAN induced investors EP Fund I (or affiliated entities) and S Fund to

25  purchase a total of more than 1,050,000 shares of uBiome Class F stock that each owned individually or

26  through trust vehicles (*i.e.*, a portion of their Founders Shares).  These investors together paid APTE and

27  RICHMAN each nearly $1.2 million for these Founders Shares.

28        60.    In addition to the funds that APTE and RICHMAN received through sales of their

Founders Shares in 2016, APTE and RICHMAN also induced investors to purchase more than $15 million in uBiome stock from uBiome in 2016. At or around this time, APTE and RICHMAN also obtained additional funds for uBiome from investors through the issuance of convertible notes.

*Series C Fundraising*

61.     As of 2017, following the 2016 investment round, APTE and RICHMAN were planning for later investment rounds in uBiome. On or about July 9, 2017, APTE and RICHMAN provided materially misleading information to a member of uBiome's Board of Directors and another individual (who each represented existing investors EP Fund I and EE Fund I and future investor E Fund I) in response to a question posed by the Board member regarding the issue of whether the interactions between uBiome's customers and the health care providers ordering uBiome's tests were adequate under health insurance provider policies or applicable standards of medical care. Specifically, APTE and RICHMAN selectively edited the response to the Board member's question that they had solicited from outside counsel by removing a portion of counsel's opinion that likely would have cast doubt on the appropriateness of the level of interaction that ECCN providers were having with uBiome customers in determining whether to approve or deny test requests. At the time, APTE and RICHMAN each knew EP Fund I, EE Fund I, E Fund I, or a related fund were potential investors in uBiome's "Series C" fundraising round or other investment vehicles.

62.     During uBiome's Series C fundraising round, which primarily occurred during the second and third quarters of 2018, APTE and RICHMAN made, and caused to be made, various material misrepresentations and false and misleading statements and omissions to investors that went to the core of APTE's and RICHMAN's depiction of uBiome's business model, "ordered by doctors, and reimbursed by insurance."

63.     With respect to the "ordered by doctors" assertion, APTE and RICHMAN concealed the fact that the majority of the doctors and other health care providers who ordered uBiome's tests fraudulently received only the information about uBiome's customers that uBiome chose for them to receive, thereby making the representation that uBiome's tests were "ordered by doctors" misleading. In a related vein, APTE and RICHMAN concealed from investors that much of uBiome's purported revenue growth from late 2017 through 2018 pertained to reimbursement claims related to upgrades.

1   Accordingly, APTE and RICHMAN made it appear to investors that the company was experiencing

2   sustained organic growth, when, in fact, and as APTE and RICHMAN well knew, a large part of

3   uBiome's purported revenues grew out of the company's efforts to fraudulently induce health care

4   providers to order upgrades with respect to existing customers' archived samples.

5       64.     With respect to the "reimbursed by insurance" assertion, APTE and RICHMAN

6   concealed the fact that, at the time of the Series C fundraising round, certain health insurance providers

7   had conducted audits or similar inquiries of, or made recoupment requests or overpayment notifications

8   regarding, uBiome's historical reimbursement claims and that those audits, inquiries, requests, and

9   notifications had revealed to APTE and RICHMAN that certain of uBiome's business practices –

10  including its failure to collect patient responsibility, its re-testing and re-billing of archived samples, and

11  its encouragement of ECCN and other health care providers to order uBiome's clinical tests regardless

12  of whether those providers used or intended to use the test results in managing uBiome's customers'

13  health care – endangered uBiome's ability to obtain reimbursement from health insurance providers and

14  made it possible that uBiome would be subject to large recoupment requests from insurance providers in

15  the future based on its past and ongoing practices.  Near the time of the Series C fundraise, APTE and

16  RICHMAN, as discussed above, falsified Chart Notes and took other steps to mislead health insurance

17  providers as to uBiome's business practices.  APTE and RICHMAN omitted to tell investors that not

18  only were insurance providers' questions about and responses to uBiome's billing practices calling

19  uBiome's entire business model into question, but that APTE and RICHMAN had had to falsify

20  documents and lie to insurance providers in order to attempt to keep them at bay.

21      65.     In addition to misrepresentations regarding uBiome's business model, APTE and

22  RICHMAN caused other misrepresentations and false and misleading statements to be made to investors

23  during uBiome's Series C fundraising round.  These material misrepresentations included that uBiome

24  had used only one, established CPT code for its SmartGut test.  This misrepresentation caused and was

25  intended to cause investors to believe that SmartGut neatly fit into a particular CPT code and thus was

26  more likely to be subject to reimbursement.  In truth, and as APTE and RICHMAN well knew, uBiome

27  used multiple CPT codes when submitting reimbursement claims.  APTE and RICHMAN knew that the

28  determination of which CPT code or codes to be used by uBiome for SmartGut and SmartJane was often

1   dependent upon the identity of the health insurance provider receiving the reimbursement claim, and

2   further knew that uBiome routinely "swapped" CPT codes when submitting claims for the "re-running"

3   or "re-sequencing" of archived samples as to which uBiome had previously submitted claims.  APTE

4   and RICHMAN did not disclose to investors that uBiome used different CPT codes for the same kind of

5   test under different circumstances, because doing so would have undermined their and uBiome's

6   assertion that the company was employing established CPT codes when seeking reimbursement for the

7   company's tests.

8          66.    During uBiome's Series C fundraising round, in or about August 2018, APTE and

9   RICHMAN each sold to investors more than 795,000 of uBiome Class F stock that each owned.  The

10  investors who purchased APTE's and RICHMAN's Founders Shares were CP Fund III, Investor 1, I

11  Fund, HP Fund III, and BG Fund Two.  These investors together paid APTE and RICHMAN each

12  approximately $5 million for these Founders Shares.

13         67.    In addition to the funds that APTE and RICHMAN each received through sales of their

14  Founders Shares in 2018, APTE and RICHMAN also induced investors to purchase more than $49

15  million in uBiome stock from uBiome in 2018 and 2019.  At or around this time, APTE and RICHMAN

16  also obtained additional funds for uBiome from investors through the issuance of convertible notes.

17                                   *Additional Misrepresentations*

18         68.    To stoke press interest and to obtain press coverage of uBiome, which press coverage

19  could then be distributed to investors, APTE and RICHMAN led others to believe that RICHMAN was

20  younger than she was.  For example, in or about June 2015, RICHMAN stated in an email to a reporter

21  who was writing an article about RICHMAN that she was "under 40," when in truth she was not.

22  RICHMAN later included a reference to the article on her resume and included a link to the article on

23  uBiome's web site and in materials that RICHMAN intended and knew would be received by investors.

24              *Transportation of Proceeds of the Conspiracy and Scheme and Artifice*

25         69.    By their actions, APTE and RICHMAN participated in transporting the proceeds they

26  obtained from the conspiracy and scheme and artifice to defraud investors from bank accounts located in

27  the Northern District of California to bank accounts located in other states in the United States and to

28  bank accounts located in other countries.

INDICTMENT                        21

1   COUNT ONE:          (18 U.S.C. § 1349 – Conspiracy to Commit Health Care Fraud)

2       70.     The factual allegations in Paragraphs 1 through 69 are re-alleged and incorporated by

3   reference.

4       71.     Beginning at a date unknown to the Grand Jury, but no later than on or about October 16,

5   2015, and continuing as to both defendants through a date unknown to the Grand Jury, but to at least

6   April 2019, in the Northern District of California, and elsewhere, the defendants,

7                           ZACHARY SCHULZ APTE
                                  and
8                       JESSICA SUNSHINE RICHMAN,

9   did knowingly and willfully conspire to execute and intend to execute a scheme and artifice to defraud

10  health care benefit programs (as defined by Title 18, United States Code, Section 24(b)) as to a material

11  matter and to obtain, by means of materially false and fraudulent pretenses, representations, and

12  promises, and by concealment of material facts, money and property owned by, and under the custody

13  and control of, such health care benefit programs, all in connection with the delivery of, and payment

14  for, health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

15      All in violation of Title 18, United States Code, Section 1349.

16

17
    COUNTS TWO THROUGH FIFTEEN:          (18 U.S.C. §§ 1347 and 2 – Health Care Fraud and Aiding
18                                                       and Abetting)

19      72.     The factual allegations in Paragraphs 1 through 71 are re-alleged and incorporated by

20  reference.

21      73.     On or about the dates set forth in the separate counts below, in the Northern District of

22  California, and elsewhere, the defendants,

23                          ZACHARY SCHULZ APTE
                                  and
24                      JESSICA SUNSHINE RICHMAN,

25  did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud health care

26  benefit programs as to a material matter and to obtain by means of materially false and fraudulent

27  pretenses, representations, and promises, and by concealment of material facts, money and property

28  owned by, and under the custody and control of, those health care benefit programs, all of the preceding

INDICTMENT                            22

in connection with the delivery of, and payment for, health care benefits, items, and services.  The

defendants APTE and RICHMAN did so by submitting and causing to be submitted the following

reimbursement claims to health insurance providers:

| COUNT | DATE | DESCRIPTION OF REIMBURSEMENT CLAIM |
|---|---|---|
| TWO | March 30, 2016 | Claim in the amount of $2,900 submitted to Anthem Blue Cross for SmartGut customer A.B. with Date of Service March 30, 2016.  UBiome billed using CPT code 87507.  The insurer received the claim on or about March 31, 2016, and identified it by claim number 16091BQ4794. |
| THREE | March 30, 2016 | Claim in the amount of $2,900 submitted to Anthem Blue Cross for SmartGut customer A.B. with Date of Service March 30, 2016.  UBiome billed using CPT code 87507.  The insurer received the claim on or about March 30, 2016, and identified it by claim number 16090CV4995. |
| FOUR | March 30, 2016 | Claim in the amount of $2,900 submitted to Anthem Blue Cross for SmartGut customer T.S. with Date of Service March 30, 2016.  UBiome billed using CPT code 87507.  The insurer received the claim on or about March 30, 2016, and identified it by claim number 16090CV4994. |
| FIVE | March 30, 2016 | Claim in the amount of $2,900 submitted to Anthem Blue Cross for SmartGut customer T.S. with Date of Service March 30, 2016.  UBiome billed using CPT Code 87507.  The insurer received the claim on or about March 31, 2016, and identified it by claim number 16091BQ4795. |
| SIX | April 23, 2016 | Claim in the amount of $2,900 submitted to Anthem Blue Cross for SmartGut Customer K.L. with Date of Service April 23, 2016.  UBiome billed using CPT code 87507.  The insurer received the claim on or about April 25, 2016, and identified it by claim number 16116BV3687. |
| SEVEN | March 26, 2017 | Claim in the amount of $2,970 submitted to Blue Shield of California for SmartGut customer G.S. with Date of Service March 26, 2017.  UBiome billed using CPT Codes 87493, 87798.  The insurer received the claim on or about March 27, 2017, and identified it by claim number 1711733162. |

| COUNT | DATE | DESCRIPTION OF REIMBURSEMENT CLAIM |
|---|---|---|
| EIGHT | December 28, 2017 | Claim in the amount of $2,900 submitted to Harvard Pilgrim Health Care for SmartGut test customer L.S. with Date of Service December 28, 2017.  UBiome billed using CPT code 87507.  The insurer received the claim on or about January 29, 2018, and identified it by claim number 171208JP2P5500. |
| NINE | April 5, 2018 | UBiome letter to Harvard Pilgrim Health Care enclosing Test Requisition Forms and preliminary Test Results. |
| TEN | May 10, 2018 | UBiome letter dated May 10, 2018, to Anthem Blue Cross, Woodland Hills, CA, enclosing, among other things, Test Requisition Forms, Chart Notes, and purported Test Results. |
| ELEVEN | May 24, 2018 | Claim in the amount of $2,900 submitted to TRICARE for SmartGut test customer B.C. with Date of Service May 24, 2018.  UBiome billed using CPT code 87507.  TRICARE assigned the claim identifier 2018145CAX0V4Y2735585. |
| TWELVE | May 30, 2018 | Claim in the amount of $2,900 submitted to TRICARE for SmartGut test customer B.C. with Date of Service May 30, 2018.  UBiome billed using CPT code 87507.  TRICARE assigned the claim identifier 2018151CAX125C5213715. |
| THIRTEEN | July 13, 2018 | UBiome letter dated July 13, 2018, to Harvard Pilgrim Health Care Special Investigations Unit, Quincy, MA, containing misrepresentations regarding, among other topics, uBiome's "pilot," billing of patients for their financial responsibility, financial assistance program, and claims regarding upgrades. |
| FOURTEEN | October 16, 2018 | UBiome letter dated October 16, 2018, to Cigna Special Investigations Unit, Hartford, CT, making representations about patient responsibility, among other things. |
| FIFTEEN | November 14, 2018 | UBiome letter dated November 18, 2018, to UnitedHealthcare, enclosing Letter of Medical Necessity, Test Requisition Form, Chart Notes, and Test Results related to SmartGut customer D.S. |

Each in violation of Title 18, United States Code, Sections 1347 and 2.

COUNTS SIXTEEN THROUGH TWENTY-ONE: (18 U.S.C. §§ 1028A(a)(1) & 2 – Aggravated Identity Theft and Aiding and Abetting)

74.     On or about the dates set forth in the separate counts below, in the Northern District of

California, and elsewhere, the defendants,

ZACHARY SCHULZ APTE
and
JESSICA SUNSHINE RICHMAN,

did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit 18 U.S.C. §§ 1347, 1349, knowing that the means of identification belonged to another actual person:

| COUNT | DATE | DESCRIPTION OF USE OF THE MEANS OF IDENTIFICATION |
|-------|------|---------------------------------------------------|
| SIXTEEN | May 10, 2018 | Chart Note dated December 30, 2016, regarding J.N. and using the name and NPI of S.D., submitted to Anthem Blue Cross, as alleged in Count Ten |
| SEVENTEEN | May 10, 2018 | Chart Note dated January 27, 2017, regarding J.N. and using name and NPI of S.D., submitted to Anthem Blue Cross, as alleged in Count Ten |
| EIGHTEEN | May 10, 2018 | Chart Note dated February 15, 2017, regarding J.N. and using name and NPI of S.D., submitted to Anthem Blue Cross, as alleged in Count Ten |
| NINETEEN | May 10, 2018 | Chart Note dated November 12, 2017, regarding C.D. and using name and NPI of J.L., submitted to Anthem Blue Cross, as alleged in Count Ten |
| TWENTY | November 14, 2018 | Chart Note dated September 27, 2017, regarding D.S. and using name and NPI of J.S., submitted to UnitedHealthcare (Optum), as alleged in Count Fifteen |
| TWENTY-ONE | January 12, 2019 | Chart Note dated July 27, 2018, regarding T.A. and using name and NPI of G.T., submitted to Kaiser Permanente, in furtherance of the conspiracy alleged in Count One |

Each in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

COUNT TWENTY-TWO:     (18 U.S.C. § 371 – Conspiracy to Commit Wire Fraud and Securities Fraud)

75.     The factual allegations in Paragraphs 1 through 74 are re-alleged and incorporated by reference.

76.     Beginning at a date unknown to the Grand Jury, but by no later than in or about 2015, and continuing until in or about April 2019 as to both defendants, in the Northern District of California, and

INDICTMENT                              25

elsewhere, the defendants,

**ZACHARY SCHULZ APTE**
and
**JESSICA SUNSHINE RICHMAN,**

did knowingly and willfully conspire to commit offenses against the United States, to wit, wire fraud in violation of Title 18, United States Code, Section 1343, and fraud in connection with the purchase and sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5.

Overt Acts

In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Northern District of California, and elsewhere:

77.    In or about November 2015 and February 2016, APTE and RICHMAN caused uBiome to submit reimbursement claims to insurance companies.

78.    On or about March 19, 2016, RICHMAN sent an email to a representative of EP Fund I EP Fund I, EE Fund I, and EP GP I, which email attached a slide deck containing financial and other information about uBiome and its business.

79.    On or about May 4, 2016 and on or about May 10, 2016, APTE and RICHMAN caused emails to be sent to representatives of Investor 2 and to Investor 2, respectively, which emails attached documents containing financial information about uBiome.

80.    On or about July 9, 2017, RICHMAN sent an email (copied to APTE) to a member of uBiome's Board of Directors and another individual (who each represented existing investors EP Fund I and EE Fund I and future investor E Fund I), as alleged in Paragraph 61.

81.    On or about June 4, 2018, RICHMAN sent an email (copied to APTE) to various representatives of O Fund, which email attached a slide deck containing financial and other information about uBiome and its business.

82.    On or about June 18, 2018, RICHMAN sent an email (copied to APTE) to a representative of O Fund containing information about CPT codes used by uBiome with respect to SmartGut and SmartJane.

All in violation of Title 18, United States Code, Section 371.

COUNTS TWENTY-THREE THROUGH THIRTY-TWO:     (18 U.S.C. §§ 1343 & 2 – Wire
                                           Fraud and Aiding and Abetting)

83.     The factual allegations in Paragraphs 1 through 82 are re-alleged and incorporated by reference.

<u>Execution of the Scheme and Artifice to Defraud Investors</u>

84.     On or about the dates set forth in the separate counts below, in the Northern District of California, and elsewhere, the defendants,

ZACHARY SCHULZ APTE
and
JESSICA SUNSHINE RICHMAN,

having knowingly, and with the intent to defraud, devised and intended to devise a scheme and artifice to defraud investors as to a material matter and to obtain money and property from investors by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, which scheme and artifice is described in part above, and for the purpose of executing such scheme and artifice, and attempting to do so, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and pictures, namely, the following wire transfers of funds, each processed through Federal Reserve System computers located outside of the state of California, and the following interstate email communication:

| COUNT | DATE | DESCRIPTION OF WIRE TRANSFER |
|---|---|---|
| TWENTY-THREE | May 2, 2016 | Wire transfer of $12,099,998.97 from bank account numbered ending -8629 at First Republic Bank, sent on behalf of EP Fund I to SVB account numbered ending -9924, for the purchase of uBiome stock |
| TWENTY-FOUR | May 2, 2016 | Wire transfer of $699,998.93 from bank account numbered ending -8629 at First Republic Bank, sent on behalf of EP Fund I to SVB account numbered ending -4408, for the purchase of APTE Founders Shares |
| TWENTY-FIVE | May 2, 2016 | Wire transfer of $699,998.93 from bank account numbered ending -8629 at First Republic Bank, sent on behalf of EP Fund I to SVB account numbered ending -4408, for the purchase of RICHMAN Founders Shares |

| COUNT | DATE | DESCRIPTION OF WIRE TRANSFER |
|---|---|---|
| TWENTY-SIX | September 2, 2016 | Wire transfer of $999,999.78 from Bank of New York Mellon account/customer identifier numbered ending -2002, sent on behalf of S Fund to SVB account numbered ending -4408, for the purchase of APTE Founders Shares and RICHMAN Founders Shares |
| TWENTY-SEVEN | June 18, 2018 | Email from RICHMAN outside of the state of Illinois to representative of O Fund and B Investments in Illinois containing misrepresentation that uBiome used a single CPT code (87507) when billing for SmartGut |
| TWENTY-EIGHT | August 17, 2018 | Wire transfer of $295,188.90 from bank account numbered ending -8629 at First Republic Bank, sent on behalf of EP Fund I to SVB account numbered ending -9924, for purchase of uBiome stock |
| TWENTY-NINE | August 23, 2018 | Wire transfer of $249,995.25 from bank account numbered ending -5979 at Citibank sent on behalf of BG Fund Two to SVB account numbered ending -4408, for the purchase of APTE Founders Shares |
| THIRTY | August 23, 2018 | Wire transfer of $250,001.54 from bank account numbered ending -5979 at Citibank sent on behalf of BG Fund Two to SVB account numbered ending -4408, for the purchase of RICHMAN Founders Shares |
| THIRTY-ONE | August 24, 2018 | Wire transfer of $999,999.85 from bank account numbered ending -1063 at Pacific Western Bank, sent on behalf of I Fund to Bank of America account numbered ending -6243, for the purchase of APTE's Founders Shares |
| THIRTY-TWO | August 24, 2018 | Wire transfer of $999,999.85 from bank account numbered ending -1063 at Pacific Western Bank sent on behalf of I Fund to Chase Bank for the ultimate benefit of National Financial Services (Fidelity) account numbered ending -5570, for the purchase of RICHMAN Founders Shares |

Each in violation of Title 18, United States Code, Sections 1343 and 2.

COUNTS THIRTY-THREE THROUGH FORTY-ONE:        (15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2 – Fraud in Connection with the Purchase and Sale of Securities and Aiding and Abetting)

85.     The factual allegations in Paragraphs 1 through 84 are re-alleged and incorporated by

reference.

Execution of the Scheme and Artifice to Defraud Investors

86.      On or about the dates set forth in the separate counts below, in the Northern District of California, and elsewhere, the defendants,

ZACHARY SCHULZ APTE
and
JESSICA SUNSHINE RICHMAN,

did knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, use and employ manipulative and deceptive devices and contrivances, and aided and abetted others in using and employing manipulative and deceptive devices and contrivances, in connection with the purchase and sale of securities issued by uBiome, in contravention of Rule 10b-5 (17 C.F.R. § 240.10b-5) of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing uBiome to make untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon purchasers of the securities of uBiome, to wit, used and caused others to use the means and instrumentalities of interstate commerce in the manner, and on the dates, set forth below:

| COUNT | DATE | DESCRIPTION OF PURCHASE OF SECURITIES |
|---|---|---|
| THIRTY-THREE | May 2, 2016 | Investment of $430,662.56 by A Fund IV, constituting a portion of the total price of A Fund IV's purchase of uBiome stock with a total value of $499,999.89 |
| THIRTY-FOUR | July 30, 2018 | Investment of $500,000.00 by B Investments, for the purchase of uBiome stock for the benefit of O Fund |
| THIRTY-FIVE | August 17, 2018 | Investment of $9,999,998.43 by trust of Investor 2, for purchase of uBiome stock |
| THIRTY-SIX | August 24, 2018 | Investment of $250,001.54 by CP Fund III, for the purchase of APTE Founders Shares |
| THIRTY-SEVEN | August 24, 2018 | Investment of $249,995.25 by CP Fund III, for the purchase of RICHMAN Founders Shares |
| THIRTY-EIGHT | August 24, 2018 | Investment of $999,999.85 by Investor 1, for the purchase of APTE Founders Shares |
| THIRTY-NINE | August 24, 2018 | Investment of $999,999.85 by Investor 1, for the purchase of RICHMAN Founders Shares |

INDICTMENT                                    29

| COUNT | DATE | DESCRIPTION OF PURCHASE OF SECURITIES |
|---|---|---|
| FORTY | September 12, 2018 | Investment of $9,999,998.42 by G Fund, for the purchase of uBiome stock |
| FORTY-ONE | November 19, 2018 | Investment of $4,968,216.84 by O Fund, constituting a portion of the total price of O Fund's purchase of uBiome stock with a total value of $5,000,000 |

Each in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

COUNTS FORTY-TWO AND FORTY-THREE:   (18 U.S.C. §§ 1957 & 2 – Engaging in Monetary Transactions with Proceeds of Specified Unlawful Activity and Aiding and Abetting)

87.   The factual allegations in Paragraphs 1 through 86 are re-alleged and incorporated by reference.

88.   Among other transactions, on or about the dates set forth in the separate counts below, in the Northern District of California, and elsewhere, the defendant

ZACHARY SCHULZ APTE

did knowingly engage in a monetary transaction by, through, and to a financial institution, in and affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from the specified unlawful activities of wire fraud, fraud in the sale of securities, and conspiracy to commit those offenses:

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| FORTY-TWO | January 31, 2019 | Transfer of $500,000 from Bank of America account numbered ending -7572 to TD Bank account numbered ending -6944 |
| FORTY-THREE | June 6, 2019 | Posting of check number 153 drawn on TD Bank account numbered ending -6936 in the amount of $2,250,000, payable to law firm, with memo line "retainer" |

Each in violation of Title 18, United States Code, Sections 1957 and 2.

/ / /

/ / /

/ / /

/ / /

INDICTMENT                                        30

COUNTS FORTY-FOUR THROUGH FORTY-SEVEN:   (18 U.S.C. §§ 1957 & 2 – Engaging in Monetary Transactions with Proceeds of Specified Unlawful Activity and Aiding and Abetting)

89.   The factual allegations in Paragraphs 1 through 88 are re-alleged and incorporated by reference.

90.   Among other transactions, on or about the dates set forth in the separate counts below, in the Northern District of California, and elsewhere, the defendant

<div align="center">JESSICA SUNSHINE RICHMAN</div>

did knowingly engage in a monetary transaction by, through, and to a financial institution, in and affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from the specified unlawful activities of wire fraud, fraud in the sale of securities, and conspiracy to commit those offenses.

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| FORTY-FOUR | June 25, 2019 | Posting of check number 280 drawn on TD Bank account numbered ending -7531 in the amount of $2,000,000, payable to law firm trust IOLTA, with memo line "legal retainer" |
| FORTY-FIVE | September 4, 2019 | Transfer of $186,984.62 from National Financial Services (Fidelity) account numbered ending -5570 to Wells Fargo, to pay down the principal balance on a mortgage loan pertaining to residence in Camas, Washington, previously purchased with APTE |
| FORTY-SIX | September 6, 2019 | Transfer of $336,244.01 from National Financial Services (Fidelity) account numbered ending -5570, intended for the ultimate purchase of a Guardian Life Annuity guaranteeing monthly income stream |
| FORTY-SEVEN | October 1, 2019 | Transfer of $900,000 from National Financial Services (Fidelity) account numbered ending -5570 to Bank of America account numbered ending 0881, intended as partial payment for residence in south Florida |

Each in violation of Title 18, United States Code, Sections 1957 and 2.

FORFEITURE ALLEGATIONS:   (18 U.S.C. §§ 981(a)(1)(C), 982(a)(1) & 982(b)(1) & 28 U.S.C. § 2461)

91.   The factual allegations in Paragraphs 1 through 90 are re-alleged and incorporated by reference for the purpose of alleging forfeiture.

92.   Upon conviction of any of the offenses alleged in Counts One through Fifteen and Twenty-Two through Forty-One, the defendants,

ZACHARY SCHULZ APTE
and
JESSICA SUNSHINE RICHMAN,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, any property, real and personal, which constitutes or is derived from proceeds traceable to said violations, including but not limited to:

a.   A forfeiture money judgment in the amount of such proceeds; and

b.   Two condominiums located at 465 Ocean Drive, Units 315 and 316, Miami Beach, Florida 33139.

93.   If, as a result of any act or omission of either defendant, any of said property identified above:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to or deposited with a third person;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property, which cannot be divided without difficulty;

the United States shall, pursuant to 21 U.S.C. § 853(p) (as incorporated by 28 U.S.C. § 2461(c)), seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

94.   Upon a conviction for the offenses alleged in Counts Forty-Two through Forty-Seven of this Indictment, the defendants,

ZACHARY SCHULZ APTE
and
JESSICA SUNSHINE RICHMAN,

shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(1) all property, real and personal, involved in said violations, or any property traceable to such property, including but not limited to:

a.   A forfeiture money judgment in the amount of the financial transactions alleged in Counts Forty-Two and Forty-Three (as to APTE) and Counts Forty-Four through Forty-Seven (as to

INDICTMENT                                  32

RICHMAN); and

      b.        Two condominiums located at 465 Ocean Drive, Units 315 and 316, Miami Beach, Florida 33139.

      95.      If, as a result of any act or omission of either defendant, any of said property identified above:

      a.        cannot be located upon the exercise of due diligence;

      b.        has been transferred or sold to, or deposited with, a third person;

      c.        has been placed beyond the jurisdiction of the Court;

      d.        has been substantially diminished in value; or

      e.        has been commingled with other property that cannot be divided without difficulty;

the United States shall, pursuant to 21 U.S.C. § 853(p) (as incorporated by 18 U.S.C. § 982(b)(1)), seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

      All pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1), and 982(b)(1), Title 28, United States Code, Section 2461(c), and Federal Rule of Criminal Procedure 32.2.


DATED:  March 18, 2021                        A TRUE BILL.

                                             /s/

                                   _____

                                   FOREPERSON


STEPHANIE M. HINDS
Acting United States Attorney

 /s/ Laura Vartain Horn
_____
LAURA VARTAIN HORN
Assistant United States Attorney

 /s/ Kyle F. Waldinger
_____
KYLE F. WALDINGER
Assistant United States Attorney


INDICTMENT                33

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT   ☐ INFORMATION   ☒ INDICTMENT

☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

### OFFENSE CHARGED

See Penalty Sheet Attachment

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:   See Penalty Sheet Attachment

**DEFENDANT - U.S**

JESSICA SUNSHINE RICHMAN, a/k/a Jessica Richman

DISTRICT COURT NUMBER

CR 21-0116 CRB

**FILED**

Mar 18 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

### PROCEEDING

**Name of Complainant Agency, or Person (& Title, if any)**

Various law enforcement agencies

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:   SHOW DOCKET NO.

   ☐ U.S. ATTORNEY   ☐ DEFENSE }

☐ this prosecution relates to a pending case involving this same defendant   MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under }

**Name and Office of Person Furnishing Information on this form**   STEPHANIE HINDS

☒ U.S. Attorney   ☐ Other U.S. Agency

**Name of Assistant U.S. Attorney (if assigned)**   Kyle Waldinger/Laura Vartain

### DEFENDANT

**IS *NOT* IN CUSTODY**

1) ☒ Has not been arrested, pending outcome this proceeding.
   If not detained give date any prior summons was served on above charges ▸ _____

2) ☒ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)
   _____

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction }  ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution
_____

Has detainer been filed?   ☐ Yes   ☐ No }   If "Yes" give date filed _____

**DATE OF ARREST**   Month/Day/Year _____

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY**   Month/Day/Year _____

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT   Bail Amount: no bail

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

Defendant Address:

*\* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Date/Time: _____   Before Judge: _____

Comments:

**Penalty Sheet Attachment**

**Count One:** Conspiracy to Commit Health Care Fraud, 18 U.S.C. § 1349
**Counts Two through Fifteen:** Health Care Fraud and Aiding and Abetting, 18 U.S.C. §§ 1347 & 2

- 20 years' imprisonment
- $250,000 fine or twice the gross gain or gross loss, whichever is greater
- 3 years' supervised release
- $100 special assessment
- Restitution
- Forfeiture

**Counts Sixteen through Twenty-One:** Aggravated Identity Theft, 18 U.S.C. § 1028A(a)(1)

- Two years mandatory consecutive term of imprisonment
- $250,000 fine or twice the gross gain or gross loss, whichever is greater
- 1 year supervised release
- $100 special assessment
- Restitution

**Count Twenty-Two:** Conspiracy to Commit Wire Fraud and Securities Fraud, 18 U.S.C. § 371

- 5 years' imprisonment
- $250,000 fine or twice the value of the property involved in the transaction, whichever is greater
- 3 years' supervised release
- $100 special assessment
- Restitution
- Forfeiture

**Counts Twenty-Three through Thirty-Two**: Wire Fraud and Aiding and Abetting, 18 U.S.C. §§ 1343 & 2

- 20 years' imprisonment
- $250,000 fine or twice the gross gain or gross loss, whichever is greater
- 3 years' supervised release
- $100 special assessment
- Restitution
- Forfeiture

**Counts Thirty-Three through Forty-One**: Fraud in Connection with the Purchase and Sale of Securities and Aiding and Abetting, 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2

- 20 years' imprisonment
- $5,000,000 fine or twice the gross gain or gross loss, whichever is greater
- 3 years' supervised release
- $100 special assessment
- Restitution
- Forfeiture

**Counts Forty-Two and Forty-Three (as to defendant APTE) and Counts Forty-Four through Forty-Seven (as to defendant RICHMAN)**: Engaging in Monetary Transactions with Proceeds of Specified Unlawful Activity and Aiding and Abetting, 18 U.S.C. §§ 1957 & 2

- 10 years' imprisonment
- $250,000 fine or twice the amount of the criminally derived property involved in the transaction, whichever is greater
- 3 years' supervised release
- $100 special assessment
- Forfeiture

**Forfeiture Allegations**: 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1) & 982(b)(1) & 28 U.S.C. § 2461

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT

☐ SUPERSEDING

---

**OFFENSE CHARGED**

See Penalty Sheet Attachment

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:  See Penalty Sheet Attachment

---

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

**DEFENDANT - U.S**

► ZACHARY SCHULZ APTE, a/k/a ZACHARY APTE, a/k/a ZAC APTE

DISTRICT COURT NUMBER

CR 21-0116 CRB

**FILED**

Mar 18 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

---

**PROCEEDING**

Name of Complainant Agency, or Person (& Title, if any)

Various law enforcement agencies

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY  ☐ DEFENSE  } SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under }

Name and Office of Person Furnishing Information on this form    STEPHANIE HINDS

☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)    Kyle Waldinger/Laura Vartain

---

**DEFENDANT**

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒  If not detained give date any prior summons was served on above charges ►

2) ☒  Is a Fugitive

3) ☐  Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☐  On this charge

5) ☐  On another conviction  }

6) ☐  Awaiting trial on other charges    ☐ Federal  ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer been filed?  ☐ Yes  } If "Yes" give date filed
☐ No

**DATE OF ARREST**    Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY**    Month/Day/Year

☐ This report amends AO 257 previously submitted

---

**ADDITIONAL INFORMATION OR COMMENTS**

PROCESS:

☐ SUMMONS  ☐ NO PROCESS*  ☒ WARRANT    Bail Amount: no bail

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time:                    Before Judge:

Comments:

**Penalty Sheet Attachment**

**Count One:** Conspiracy to Commit Health Care Fraud, 18 U.S.C. § 1349

**Counts Two through Fifteen:** Health Care Fraud and Aiding and Abetting, 18 U.S.C. §§ 1347 & 2

- 20 years' imprisonment
- $250,000 fine or twice the gross gain or gross loss, whichever is greater
- 3 years' supervised release
- $100 special assessment
- Restitution
- Forfeiture

**Counts Sixteen through Twenty-One:** Aggravated Identity Theft, 18 U.S.C. § 1028A(a)(1)

- Two years mandatory consecutive term of imprisonment
- $250,000 fine or twice the gross gain or gross loss, whichever is greater
- 1 year supervised release
- $100 special assessment
- Restitution

**Count Twenty-Two:** Conspiracy to Commit Wire Fraud and Securities Fraud, 18 U.S.C. § 371

- 5 years' imprisonment
- $250,000 fine or twice the value of the property involved in the transaction, whichever is greater
- 3 years' supervised release
- $100 special assessment
- Restitution
- Forfeiture

**Counts Twenty-Three through Thirty-Two**: Wire Fraud and Aiding and Abetting, 18 U.S.C. §§ 1343 & 2

- 20 years' imprisonment
- $250,000 fine or twice the gross gain or gross loss, whichever is greater
- 3 years' supervised release
- $100 special assessment
- Restitution
- Forfeiture

**Counts Thirty-Three through Forty-One**: Fraud in Connection with the Purchase and Sale of Securities and Aiding and Abetting, 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2

- 20 years' imprisonment
- $5,000,000 fine or twice the gross gain or gross loss, whichever is greater
- 3 years' supervised release
- $100 special assessment
- Restitution
- Forfeiture

**Counts Forty-Two and Forty-Three (as to defendant APTE) and Counts Forty-Four through Forty-Seven (as to defendant RICHMAN)**: Engaging in Monetary Transactions with Proceeds of Specified Unlawful Activity and Aiding and Abetting, 18 U.S.C. §§ 1957 & 2

- 10 years' imprisonment
- $250,000 fine or twice the amount of the criminally derived property involved in the transaction, whichever is greater
- 3 years' supervised release
- $100 special assessment
- Forfeiture

**Forfeiture Allegations**: 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1) & 982(b)(1) & 28 U.S.C. § 2461