# Exhibit 2

ERIN E. SCHNEIDER (Cal. Bar No. 216114)
MONIQUE C. WINKLER (Cal. Bar No. 213031)
BERNARD B. SMYTH (Cal. Bar No. 217741)
  smythb@sec.gov
THOMAS J. EME (Ill. Bar No. 6224870)
  emet@sec.gov
DAVID ZHOU (NY Bar No. 4926523)
  zhoud@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile:  (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | |
| JESSICA RICHMAN and ZACHARY APTE, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("the Commission" or "the SEC") alleges:

**SUMMARY OF THE ACTION**

1. During 2018, Jessica Richman and Zachary Apte (together, "Defendants") fraudulently raised approximately $60 million for the private company they founded, uBiome, Inc. ("uBiome" or "the company"), a San Francisco medical testing company that Richman told investors was "inventing the microbiome industry" and "making products that improve people's lives." The 2018 "Series C" fundraising round led by Defendants valued uBiome at nearly $600 million, and enriched Richman and Apte by millions each through the sale of their own uBiome shares during the round.

COMPLAINT                                              1

2. To make the securities offering a success, Richman, who was the Chief Executive Officer of uBiome, and Apte, who was its Chief Scientific Officer, painted a false picture of uBiome as a rapidly growing company with a strong track record of reliable revenue through health insurance reimbursements for its tests, one to detect "gut" microorganisms and another for women's health. Defendants also made numerous misrepresentations that were designed to assure investors that the company's business model and its tests were widely accepted by health insurance companies and downplay any risks to the company's revenue. Investors invested millions of dollars in uBiome based on Defendants' misrepresentations.

3. uBiome's purported success in generating revenue, however, was a sham. It depended on duping doctors into ordering unnecessary tests and other improper practices that Richman and Apte directed and which, once discovered, led insurers to claw back their previous reimbursement payments to uBiome. Although uBiome employees raised concerns regarding the company's practices, Defendants failed to take action to remedy the improper practices. They also failed to disclose those practices to investors. Moreover, Defendants acted to conceal the improper practices from uBiome's general counsel, uBiome's board, and insurers, including directing uBiome employees to provide insurers with backdated and misleading medical records to substantiate the company's prior claims for reimbursement.

4. Defendants' scheme unraveled in or about April 2019, when the company's Board of Directors initiated an internal investigation, following the FBI's execution of a search warrant at uBiome's San Francisco headquarters. That investigation brought uBiome's improper billing practices to light and made clear that uBiome's business model was untenable. uBiome then suspended its clinical tests business, and in September 2019 ceased operations and filed for bankruptcy protection. The company is currently undergoing Chapter 7 bankruptcy liquidation.

5. By their actions, Defendants violated the antifraud provisions of the federal securities laws. Specifically, Defendants violated 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

6. The SEC requests, among other things, that the Court: (i) permanently enjoin Defendants from further violating the federal securities laws as alleged in this complaint; (ii) permanently enjoin Defendants from participating in the issuance, purchase, offer, or sale of any security; (iii) prohibit Defendants from acting as an officer or director of a publicly traded company; (iv) order Defendants to pay disgorgement with prejudgment interest; and (v) order Defendants to pay civil monetary penalties.

## JURISDICTION AND VENUE

7. The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9. Defendants, directly or indirectly, made use of the means and instruments of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

10. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. Defendants met with and solicited prospective investors in this District, and offers and sales of securities took place in this District.

11. Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Francisco or Oakland Division because a substantial part of the events or omissions that give rise to the claims alleged herein occurred in San Francisco County, where uBiome's principal place of business was located.

## DEFENDANTS

12. **Jessica Richman** ("Richman"), age 46, together with co-Defendant Zachary Apte, co-founded uBiome in 2012. At all relevant times, Richman was the Chief Executive Officer and

COMPLAINT 3

President of uBiome, and a member of uBiome's Board of Directors. During the Commission's investigation, Richman declined to answer all questions concerning the investigation on the basis of her Fifth Amendment privilege against self-incrimination.

13. **Zachary Apte** ("Apte"), age 36, was, at all relevant times, the Chief Scientific Officer of uBiome and a member of uBiome's Board of Directors. At times, he also used the title of co-CEO of uBiome. During the Commission's investigation, Apte declined to answer all questions concerning the investigation on the basis of his Fifth Amendment privilege against self-incrimination.

### RELATED ENTITY

14. **uBiome, Inc.** is a Delaware corporation that was based in San Francisco, California and co-founded by Richman and Apte in October 2012. uBiome operated in the biotech field as a medical testing company that developed and sold clinical laboratory tests to individual consumers. On September 4, 2019, uBiome filed for Chapter 11 bankruptcy protection in U.S. Bankruptcy Court for the District of Delaware. The case was later converted to a Chapter 7 proceeding.

### FACTUAL ALLEGATIONS

**I.    uBiome and its Business Model**

15. Defendants co-founded uBiome in October 2012. uBiome developed and performed proprietary laboratory tests that purportedly identified microorganisms in the gut and genitals and assisted in the diagnosis of conditions such as inflammatory bowel disease and sexually transmitted infections.

16. At all relevant times, Defendants closely monitored and managed every aspect of uBiome's operations together. Richman focused on the company's growth and financing, and Apte concentrated on the technology and science. However, Defendants addressed most issues together and no decision about a significant aspect of uBiome's business was made without the knowledge and approval of at least one of Richman or Apte. Defendants also had a romantic relationship and ultimately married in 2019.

COMPLAINT                                                    4

## II. Defendants Engaged in a Scheme to Inflate the Company's Revenue Through Improper Insurance Billing Practices

17. Beginning in or about late 2015, uBiome, at Defendants' direction, turned its focus to developing and marketing tests that could be billed to insurance companies, which generally required an order or prescription from a healthcare provider.

18. Defendants decided to pivot uBiome's business model to clinical tests—that is, those ordered by doctors rather than consumers—so that uBiome would be able to charge insurers significantly more money for the tests than it charged consumers. Those higher billings would in turn allow uBiome to dramatically accelerate its revenue growth in advance of the company's anticipated fundraising rounds and eventual initial public offering.

19. In accordance with this plan, on November 1, 2016, uBiome issued a press release announcing the launch of its first clinical test, SmartGut. The press release described SmartGut as "the world's first sequencing-based clinical microbiome screening test" and touted that "SmartGut is covered by US health insurance for the majority of patients." A year later, on November 14, 2017, uBiome announced the launch of a second clinical test, SmartJane, which the company's press release described as "the first sequencing-based at-home women's health test" and "Covered by Health Insurance."

20. Soon thereafter, Defendants, eager to demonstrate strong growth and revenue to investors in the lead up to the company's Series C fundraising round, set an internal goal of 10 percent month-over-month growth in uBiome's insurance billing volume. But to meet the goal, Defendants faced considerable challenges in satisfying health insurer requirements to reimburse the company's tests at the rate they desired.

21. Indeed, Defendants were aware, based on several warnings from company employees and uBiome's general counsel, that the company needed to meet certain health insurance company requirements before the company's tests could be approved for reimbursement. Defendants ignored these warnings and adopted and approved several improper billing practices that they knew, or were reckless in not knowing, fell below insurer requirements and thus, once discovered, would prompt insurers to reject reimbursement claims for uBiome's clinical tests. Defendants engaged in deceptive

COMPLAINT 5

1 acts to conceal facts pertinent to uBiome's practices from the company's general counsel, the uBiome
2 board, prescribing doctors, and insurers.

3     22.     As one example, Defendants oversaw the design and operation of a website portal that
4 uBiome used to connect doctors to consumers for purposes of ordering tests (the "doctor network").
5 This network was essential to uBiome's insurer reimbursement-based business model, and for
6 satisfying insurer requirements that a laboratory test be prescribed by a doctor who had formed a
7 sufficient relationship with a patient prior to ordering tests that would be covered by insurance. Yet,
8 as Defendants knew, or were reckless in not knowing, the doctor network fell below insurer
9 requirements in two aspects.

10     23.     First, as Defendants knew, the doctor network was designed to steer doctors toward
11 ordering SmartGut or SmartJane tests without establishing the required doctor-patient relationship.
12 In particular, Defendants understood that the default for doctors was to approve test requests based
13 solely on online questionnaire responses that consumers submitted through uBiome's website,
14 without any pre-existing relationship, live consultation, or further interaction between the doctor and
15 consumer. However, in July 2017, shortly after uBiome launched its doctor network, the company's
16 general counsel emailed Defendants warning them that any tests prescribed based solely on
17 consumers' questionnaires, versus a live consultation between consumer and doctor, would be a
18 reimbursement risk. Nevertheless, Defendants continued uBiome's use of the questionnaire-based
19 doctor network and concealed this fact from the general counsel and the uBiome board.

20     24.     Second, Defendants used the doctor network to dupe doctors into ordering many tests
21 of dubious clinical utility. These tests were retests of consumers' old samples, and in 2017, uBiome's
22 then-laboratory director warned Defendants that such retests lacked "current clinical relevance" and
23 could be fraudulent. Despite this warning, Defendants directed uBiome to broadly advertise the
24 retests to consumers. Defendants also acted to deceive doctors by making the consumers' resulting
25 retest requests appear to be requests for tests on new samples. For example, at Defendants' direction,
26 uBiome resubmitted consumers' originally reported symptoms to the doctors reviewing retest
27 requests as if they were newly reported symptoms. Also, at Apte's direction, written test results from
28 the original tests of the samples were withheld from doctors. Defendants then directed the company

COMPLAINT     6

to bill insurance companies for these retests in order to create the appearance of steady growth from at least late 2017 through 2018.

25. Defendants engaged in additional deceptive acts to mislead insurers about the doctor network. By May 2018, the start of uBiome's Series C offering, Defendants learned that certain insurance companies had asked uBiome to submit supporting medical records reflecting that doctors had contemporaneously consulted with patients for the billed tests. Because the records did not exist, however, Defendants directed company employees to create and backdate records to make it seem as though doctor-patient consultations had occurred, and then to submit those fake records to insurance companies.

26. Defendants' billing scheme extended to other areas. For instance, Defendants had uBiome bill for some tests that had not yet been performed and might never be performed because the version of the test to be used had not been proven to work. Defendants also ignored insurance rules that required clinical lab providers to collect from consumers applicable co-pays, coinsurance, and deductibles, collectively known as "patient responsibility." In addition, Defendants misused and manipulated the billing codes that are a key component of insurers' review of reimbursement claims. Indeed, Defendants directed the company to use incorrect insurance billing codes and/or vary the codes when billing for the same type of test to avoid claims rejection, even though there was no legitimate basis for doing so. Defendants engaged in these practices despite warnings from company employees, including warnings in August 2018 during the Series C offering.

27. Ultimately, Defendants' billing schemes enabled uBiome to access the lucrative health insurance reimbursements on which the company relied to create the appearance of rapid increases in revenue growth. Indeed, according to financial information that Richman provided to the lead investor in the Series C round, uBiome generated nearly 91 percent of its revenue from health insurance reimbursements by the first quarter of 2018. That same financial information showed that the company projected billing for its clinical tests to increase to approximately 97 percent of its total revenue by 2020.

### III. Defendants Misled Investors in uBiome's Series C Offering

#### A. uBiome's Series C Offering

28. Based on the company's false appearance of revenue growth, Defendants actively promoted the Series C offering from approximately May 2018 through September 2018. They did so despite being aware of the significant risks to their business model, including that several insurers had challenged uBiome's practices in writing before and during the offering, and despite employee warnings of insurance fraud during the offering. The offering, which valued uBiome at nearly $600 million, succeeded in raising approximately $59 million through the offer and sale of shares of uBiome's preferred stock to approximately 27 investors.

29. In addition to purchasing preferred stock in the Series C offering, approximately six investors purchased uBiome convertible promissory notes during the same period for a total of more than $2 million. The notes, which were prominently labeled as "securities" on their face, had terms of approximately 360 days and were convertible into uBiome stock. The investors who purchased the convertible promissory notes represented that they were acquiring the notes "for investment."

30. As part of the Series C offering, Richman sold uBiome stock she personally owned for approximately $5 million. Apte also sold uBiome stock he personally owned for approximately $5 million.

31. Defendants led uBiome's Series C offering and actively promoted the company to prospective investors. Defendants personally met and communicated with prospective investors as part of the company's fundraising efforts, including through participation in due diligence calls.

32. Defendants also provided prospective investors with documents in connection with the Series C offering, including pitch decks, financial information, and other promotional materials. Richman was the primary drafter of the pitch decks provided to investors.

#### B. Defendants Made Material Misrepresentation to Investors Regarding uBiome's Business Model and Ability to Generate Revenue

33. In their communications with investors during the offering, Defendants consistently painted the false picture of uBiome as a company with an established business model that had been

COMPLAINT 8

proven to generate revenue through collections from healthcare insurers and could be expected to continue to generate such revenue at a rapidly increasing rate.

34. Defendants repeatedly described uBiome's clinical tests to investors as "ordered by doctors, reimbursed by insurance." That description of uBiome's clinical test business was made in various pitch decks provided by Defendants to prospective investors between May and September 2018, during the company's Series C offering.

35. Defendants' representation of uBiome's clinical tests as "ordered by doctors, reimbursed by insurance" gave the false and misleading impression that the tests fit squarely within the well-established and lucrative healthcare insurance reimbursement model.

36. Although uBiome clinical tests were "ordered by doctors," those doctors, by Defendants' own design, often did not know what they were ordering. As described above, Defendants acted to conceal from doctors the fact that the tests they were ordering were, in many cases, actually retests of old samples with no clear clinical utility.

37. Defendants' representation of uBiome's business as one based on "reimbursement by insurance," was also false and misleading. In truth, Defendants knew, or were reckless in not knowing, that uBiome was engaged in numerous improper billing practices, as described above, that would lead insurers to deny reimbursement for tests uBiome billed, once insurers caught on to the practices. Indeed, before the end of the Series C offering, Defendants knew that multiple insurers had challenged the company's practices, with one alleging that uBiome was engaged in "fraud and abuse."

38. Defendants also misled investors by touting fantastic revenue growth while, at the same time, concealing from investors that uBiome's revenue depended on keeping insurers in the dark about the company's improper billing practices. For instance, on June 29, 2018, Apte emailed the lead Series C investor, copying Richman, stating that uBiome "billed 15,351 samples in April, with an annualized revenue run rate of $109.2 million," increasing to "16,985 samples in May, with an annualized revenue run rate of $121.2 million." Apte represented that uBiome had "3.4x the billable samples and revenue" it had in November 2017, and that the company "recognize[d] revenue of $594 per sample based on what we reasonably expect to collect on the lifetime of a sample."

COMPLAINT 9

39. Similarly, in an email that Richman sent widely to solicit Series C investors in July 2018, she wrote, copying Apte, that uBiome had achieved "[r]evenue growth of almost 900% since June 2017" and would earn "[o]ver $100 million total revenue for 2018."

40. Defendants knew, or were reckless in not knowing, that the revenue numbers and projections they provided investors were false and misleading because (i) they were achieved using billing practices that Defendants knew, or were reckless in not knowing, were improper and that insurers had begun flagging and rejecting, and (ii) a significant percentage of uBiome's sales volume and revenue as represented to investors depended on billing for retests of old samples with no clear clinical utility. Indeed, at no point during the Series C round did Defendants disclose to investors the insurer challenges to uBiome's billing practices that the company had received.

41. Defendants also falsely represented to investors that uBiome's clinical tests were covered by "existing [insurance billing] codes" and "current health plan guidelines." These misrepresentations were included in pitch decks that Richman and Apte each provided to investors during the Series C round. The lead investor found these representations to be important because they signified that uBiome could "quickly and efficiently" launch its clinical tests, thereby avoiding a years-long process for applying for a new, custom insurance billing code. In reality, however, Defendants knew, or were reckless in not knowing, that uBiome was relying on incorrect billing codes and varying billing codes by insurer to trick insurers into reimbursing the company. In August 2018, Defendants were warned by a company employee that these practices were potentially fraudulent.

42. Defendants made additional, specific representations reassuring the lead investor of the Series C round that several aspects of the company's business model were valid. For instance, Defendants claimed that the company's doctor network exceeded regulatory standards and had been vetted by uBiome's counsel. Yet, as described above, counsel in fact had warned Defendants about the risk that insurers would reject the network uBiome used.

43. Defendants' misrepresentations and other deceptive conduct regarding uBiome's business model and ability to generate revenue were important to investors because they were

directly related to the viability of uBiome's business and, therefore, the likelihood that investors would obtain a return on their investments in the company.

### IV. Defendants Fraud Unraveled when uBiome's Business and Billing Practices Came to Light

44. During the Series C offering, Defendants knew that uBiome had received challenges to the company's practices from multiple insurers, with one alleging that the company was engaged in "fraud and abuse." Nevertheless, Defendants did not disclose any of these challenges to other members of uBiome's Board of Directors until December 2018, and even then, Richman falsely represented that the company had only received one such challenge. Ultimately, by April 2019, uBiome had received letters and written communications from at least 18 insurers challenging the company's business and billing practices with several seeking clawback payments.

45. In or about April 2019, uBiome's Board of Directors initiated an internal investigation of the company's practices, following the FBI's execution of a search warrant at uBiome's San Francisco headquarters. Approximately two months after the internal investigation was initiated, Defendants were both fired.

46. In September 2019, uBiome ceased operations and filed for bankruptcy protection because it did not have a sustainable model for generating revenue. The company is currently undergoing Chapter 7 bankruptcy liquidation.

### FIRST CLAIM FOR RELIEF

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5)**

47. The Commission realleges and incorporates by reference paragraphs 1 through 46.

48. Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

    a. Employed devices, schemes, or artifices to defraud;

    b. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

   c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

49. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**(Violations of Section 17(a) of the Securities Act)**

50. The Commission realleges and incorporates by reference paragraphs 1 through 46.

51. Defendants, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means of instruments of transportation or communication in interstate commerce or by use of the mails,

   a. with scienter, employed devices, schemes, or artifices to defraud;

   b. obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

52. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

I.

Enter an order permanently enjoining Defendants from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## II.

Enter an order permanently enjoining Defendants from directly or indirectly, including, but not limited to, through any entity owned or controlled by either Defendant, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendants from purchasing or selling securities for his or her own personal account.

## III.

Enter an order requiring Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this complaint, together with prejudgment interest thereon.

## IV.

Enter an order requiring Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## V.

Enter an order prohibiting Defendants from serving as an officer or director of any issuer having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: March 18, 2021              Respectfully submitted,


/s/  Thomas J. Eme
Thomas J. Eme
Bernard B. Smyth
David Zhou
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION